# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRIAN REED, B.R., a minor, by her guardian ad litem, Roxanne Sayer,**<br><br>**Plaintiffs**<br><br>v.<br><br>**CITY OF MODESTO, a municipal corporation, Chief of Police HARDEN, in his individual capacity; Police Officer RON ZIYA, Police Officer CAELI KOEHLER, in their individual and official capacities,**<br><br>**Defendants** | **CASE NO. 1:11-CV-1083 AWI GSA**<br><br>**ORDER RE: MOTIONS IN LIMINE AND MOTION TO BIFURCATE TRIAL** |

## I. Background

On December 30, 2010, police officers were called to the residence of Plaintiff Brian Reed and Susan Nava. Nava informed the police operator that Plaintiff Reed was suicidal and sought help to stop him from hurting himself. Upon arrival, Defendant Ron Ziya and Officer Caeli Koehler saw Nava and Plaintiff Reed inside; Plaintiff Reed had a knife. Nava exited the room. Defendant Ziya and Koehler told Plaintiff Reed to drop the knife but he did not comply. Plaintiff Reed took a small step toward the police officers and Defendant Ziya shot at him multiple times, hitting him twice. Another police officer, Michelle Baker, then arrived and shot a taser at Plaintiff Reed. Plaintiff Reed's minor daughter, Plaintiff B.R., was outside during this course of events. After the shooting, Plaintiff Reed lapsed into a coma for an extended period of time. Consequently, he does not have a firm recollection of these events.

Plaintiff Reed and Plaintiff B.R. filed suit under a federal claim of 42 U.S.C. §1983 alleging excessive force in violation of the Fourth Amendment and state law claims of battery,

Cal. Civ. Code §52.1, and negligent infliction of emotional distress. All claims against Police Chief Harden and Officer Koehler were dismissed from this suit; the Section 1983 claims against Defendant City of Modesto were also dismissed. Doc. 119. The remaining defendants are Ron Ziya, on federal and state claims, and the City of Modesto, on the state law claims. This order deals with the second round of motions in limine filed by the parties. An earlier round of motions were heard and ruled on at a November 24, 2014 hearing. The trial, scheduled for December, had to be postponed as a criminal trial scheduled for the same day took precedence. The parties agreed to more depositions and a second set of motions in limine in light of the additional evidence. Oral argument on these motions in limine were held on April 20, 2015. After the hearing, Defendants filed an ex parte motion to have the trial bifurcated. Trial is scheduled to begin on Tuesday, April, 28, 2015.

**II. Legal Standard**

Motions in limine may be "made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." Luce v. United States, 469 U.S. 38, 40 n.2 (1984). Fed. Rule Evid. 403 states generally that, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." Luce v. United States, 469 U.S. 38, 41 n.4 (1984). The parties must abide by the court's rulings but may ask for reconsideration as trial progresses. "[A] ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court. The district court may change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling." United States v. Bensimon, 172 F.3d 1121, 1127 (9th Cir. 1999), citing Luce v. United States, 469 U.S. 38, 41-42 (1984).

## III. Discussion

**A. Plaintiffs' Motions in Limine**

At the earlier hearing, Plaintiffs' first motion in limine (to exclude evidence Plaintiff Reed was 'huffing gas') was granted. Plaintiffs' five other motions in limine are discussed below.

**1. Reconsideration of Plaintiffs' Motion in Limine 2**

Plaintiffs' second motion in limine sought to "preclude Defendants introducing any evidence at trial that Plaintiff BRIAN REED entered an alcohol treatment program around eight years ago or that he made some suicide threats at around that same time on the ground that such evidence would be irrelevant to any issue in the case and that even if it was relevant to some issue, its probative value would be substantially outweighed by its prejudicial effect to Plaintiff." Doc. 74, Plaintiffs Motion, 1:24-2:2. Defendants opposed the motion arguing the information was relevant to support Dr. Emily Keram's expert testimony on suicide by cop. Doc. 84, Defendants Opposition, 2:8-4:12. At the hearing, the motion was granted as "looking at the Graham v. Connor basic standards, any prior use of intoxicants, any prior drug or alcohol treatment programs, really does not fit within the parameters of the use of force analysis." Doc. 106, Transcript, 18:1-4.

Defendants seek reconsideration, arguing that this information is relevant in determining damages: "Plaintiffs' neuropsychology expert, Dr. Eric Morgenthaler, has opined that Mr. Reed suffered a decline in his cognitive abilities as a result of the shooting. The Court granted Plaintiffs' Motion in Limine No. 2 before Dr. Morgenthaler was deposed in this matter....During his deposition testimony, Dr. Morgenthaler conceded that a number of factors can cause an individual to suffer cognitive decline. Those factors include substance abuse and mental illness, both of which were present in Mr. Reed's life both before and after the shooting." Doc. 123, Defendants Motion, 3:22-4:3. Morgenthaler did not state that Plaintiff Reed's cognitive decline was due to any substance abuse but he did state that such activities could have that negative result:

Q. ...can mental illness in a person cause cognitive decline?
A. Yes.
Q. Can substance abuse cause cognitive decline?

3

A. Yes.

....

Q. And what history of substance abuse did he have prior to November 2012?

A. Well, he had a -- a prior history of alcohol abuse -- with -- let's see. He drank abusively -- drank alcohol abusively, between the 1999, 2003. The then underwent chemical dependency treatment.

....

Q. So let's assume that Mr. Reed suffered a cognitive decline at some point prior to your November 2012 examination. Could his alcohol abuse have contributed to or caused that cognitive decline?

A. Well, that was a -- a question I had that had to be addressed when I did my 2012 evaluation. And that was part of the -- you know, my concerns about the -- you know, potential ideology of cognitive declines. And that was certainly a factor. And that was the -- these were the -- well, there was a number of factors.

Doc. 123-1, Morgenthaler Deposition, 41:17-21, 43:6-11, and 44:2-11 (5-7 of 8). The cause of Plaintiff Reed's cognitive decline is relevant to Plaintiffs' claim of damages. Though evidence of alcohol abuse and suicidal threats is highly prejudicial, that danger would not substantially outweigh probative value if appropriate evidence as to causation is presented.

Plaintiffs argue "At no time has Dr. Eric Morganthaler opined that Brian Reed's cognitive deficits might have been caused by abuse of alcohol or substance abuse of any kind." Doc. 143, Plaintiffs Addendum, 1:26-27. More importantly, Plaintiffs at the hearing stated that Morgenthaler was neither qualified nor being offered as an expert on the causes of cognitive decline but only an expert on measuring cognitive level; Dr. Jack Miller is a neurologist who will be testifying to the cause of Plaintiff Reed's decline. With this understanding of Morgenthaler's expertise and the limitation on his testimony, the statements made during his deposition are insufficient to properly raise the issue of causation. Defendants do not have any expert that could opine on Plaintiff Reed's condition. Defendants have not argued or presented evidence that Miller has stated in any way that substance abuse or mental illness was a potential cause of Plaintiff Reed's cognitive decline. In the absence of appropriate evidence to support causation, Plaintiff Reed's history of substance abuse and suicidal tendencies in the early 2000s should be excluded. Defendants' motion for reconsideration is denied; the motion in limine remains granted.

**2. Plaintiffs' Motions in Limine 4 and 5**

Plaintiffs' fourth motion in limine sought to exclude all reference to Plaintiff Reed's post-shooting alcohol and drug use. Doc. 103, Plaintiffs Motion, 2:8-11.  Defendants opposed the motion, arguing that the information was relevant to Morgenthaler's finding of cognitive decline and to overall claims of damages for emotional distress. Doc. 108, Defendants Opposition, 5:11-26.  At a hearing on December 2, 2014, the motion was denied without prejudice to being raised at a later time as the trial was being delayed and the parties agreed to take additional depositions. Doc. 113.  Plaintiffs have now re-raised the issue as the fifth motion in limine. Doc. 141.  The motion was filed eight days late, in violation of the court's order setting out a briefing schedule. Doc. 122.  Consequently, Defendants did not have an opportunity to file an opposition.  However, consideration of Plaintiff Reed's post-shooting use of alcohol and drugs involves the exact same analysis as Plaintiffs' second motion in limine.  While post-shooting substance abuse is even more relevant to consideration of Plaintiff Reed's damages, Defendants have not made a sufficient proffer of evidence to allow this prejudicial information to be raised.  Plaintiffs' motion is granted.

**3. Reconsideration of Plaintiffs' Motion in Limine 3**

Plaintiffs' third motion in limine states "Dr. Keram should not be permitted to testify at all. The only opinion that she offers – that Reed attempted to commit suicide by cop - is completely irrelevant to any issue in the case and therefore inadmissible....BRIAN REED'S Constitutional right not to be subjected to unreasonable force by the police does not depend on whether or not he was suicidal or wanted the police to shoot him. Even people who are suicidal have a right not to be shot by the police unreasonably." Doc. 75, Plaintiffs Motion, 2:16-21 and 3:4-9.  Keram's testimony is intended to bolster Defendant Ziya's version of events by explaining that a person attempting to commit suicide by cop in Plaintiff Reed's situation would likely behave in an aggressive manner and refuse to comply with police commands to drop his knife. See Doc. 124, Defendants Motion, 6:15-20.  At the November 24, 2014 hearing, the motion was granted because Plaintiffs asserted that

5

> there is no material dispute about any [of] the facts leading up to the shooting at all. Plaintiff has no recollection of the shooting [and] does not dispute the factual account provided by the defendant officers. The police do not contend that Plaintiff ever advanced on them with a knife or attacked them in any way or that he even threatened them verbally. They both say that Plaintiff was shot while standing alone at the rear of his living room. Officer ZIYA admits that he advanced on Plaintiff from the front door to the middle of the living room despite knowing that he was suicidal, angry and holding a knife.... ZIYA says that he shot Plaintiff because Plaintiff moved his back foot forward and he thought Plaintiff was going to attack him. However, he also admits that Plaintiff turned and tried to run in order to avoid being shot after the first shot was fired.

Doc. 95, Plaintiffs Reply, 3:6-19. As discussed previously, "where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible." Boyd v. City & County of San Francisco, 576 F.3d 938, 944 (9th Cir. 2009). But where there is no dispute of relevant facts, there is no need for an expert witness to opine on the likelihood of events in a suicide by cop situation to bolster or challenge the credibility of witnesses who provide conflicting testimonies.

In reconsideration, Defendants argue that Plaintiffs appear to be preparing to dispute the facts surrounding the shooting and to introduce their own evidence on the issue of suicide by cop. Doc. 124, Defendants Motion, 4:24-5:5. At the April 20, 2015 hearing, Plaintiffs affirmed that they do not dispute the deposition testimony of Defendant Ziya and Koehler, the two officers present when Plaintiff Reed was shot, except to seek clarification of two small discrepancies between their testimonies. In critical part, Plaintiffs acknowledge that both officers have testified that Plaintiff Reed did take a small step forward toward them while holding a knife prior to being shot. Plaintiffs explained that they intend to present expert testimony on suicide by cop to explain police training and procedures for dealing with such situations.

Given these circumstances, Boyd remains inapplicable to this case. Keram is not needed to explain why one person's testimony conforms to a typical suicide by cop situation more than another person's testimony, but she may explain what suicide by cop is. However, that information is likely to presented by the police practices experts, at which point, Keram's testimony would be cumulative. Defendants' motion for reconsideration is denied. Keram may not opine on the credibility of Plaintiff Reed, Defendant Ziya, and Koehler; Keram may only testify to define and give general background on suicide by cop if such testimony does not prove

to be cumulative.

**4. Plaintiffs' Motion in Limine 6**

Plaintiffs seek to exclude

a number of 'bad acts' that plaintiff BRIAN REED may have committed over the course of his life in the years and days prior to the shooting. They include the following:

Susan Nava reportedly told Detective Craig Grogan that she had three children by a prior marriage: David Nava (17 yrs.), Alice Nava (14 yrs.) and Joe Nava (12 yrs.) Detective Grogan reports that Susan Nava told him that around a year prior to the shooting, Brian had choked her son, David, until he had 'turned purple'. On another occasion, Brian had kneed her son, Joey, in the back. Susan also said that Brian frequently berated her children verbally, calling them "worthless pieces of shit." Susan reportedly told police that around two weeks before the incident, Brian had dragged her daughter off of her bed by her foot and pulled her out the front door. She told police that her children never liked Brian and that Brian never made an attempt to have a good relationship with them. In addition, Susan told Detective Grogan that Brian has 'OCD' (obsessive-compulsive disorder) and does not get along well with her children; that he maintains high standards for the children's behavior and for Susan's house cleaning.

Doc. 128, Plaintiffs Motion, 2:4-21.  Defendants concede that Plaintiff Reed's alleged OCD and high standards for behavior are inadmissible. Doc. 131, Defendants Opposition, 2:1-3.

Defendants state they "expect Plaintiff Brian Reed to offer testimony that he has suffered tremendous emotional harm, which has led to an unstable family environment and a lack of personal relationships, as a result of the incident.  Testimony that Mr. Reed physically struck each of Ms. Nava's children, berated them, and failed to develop a relationship with them, will establish that the amount of emotional harm that Mr. Reed may have experienced since the incident is less than Mr. Reed contends." Doc. 131, Defendants Opposition, 2:6-12.  Plaintiffs counter that "Mr. Reed's inability to get along with Ms. Nava's children is simply not an issue in this case at all. Brian Reed does not sue for damages because his relationship with Susan Nava or her children was unhappy.  He sues for emotional distress related to the shooting incident in which he nearly died and which has caused him extremely severe and seemingly permanent psychiatric injury including increased depression and anxiety, post-traumatic stress disorder, panic attacks, and other serious problems." Doc. 140, Plaintiffs Reply, 2:12-19.  At the hearing, Plaintiffs clarified that Plaintiff Reed's damages consists of economic damages, pain and suffering, and general decline in

7

quality of life.  Further, Plaintiffs stated that Plaintiff Reed and Plaintiff B.R. are not seeking damages for any decline in family relations.  Plaintiff B.R.'s damages will be limited to her mental suffering at the time of the shooting itself.  Given these limitations, the bad acts described above are highly prejudicial and have low probative value as Plaintiff Reed is not asserting that any subsequent breakdown of family relations was due to his shooting.  Plaintiffs' motion is granted.

**B. Defendants' Motions in Limine**

At the November 24, 2014 hearing, Defendants first (to exclude alternate theories of liability against Defendant Koehler), second (to exclude other bad acts of Defendants), and third (to limit damages for past medical bills to amounts actually paid) motions in limine were granted. Defendants' four other motions in limine are discussed below.

**1. Reconsideration of Defendants' Motion in Limine 4**

Defendants sought a ruling "(1) excluding any witness from making reference to Plaintiffs' life care plan, including but not limited to the projected cost of Plaintiff Brian Reed's future medical care, (2) excluding Plaintiffs' life care expert, Carol Hyland, from testifying at trial, and (3) excluding any testimony from Plaintiffs' expert economist, Robert Johnson, relating to the cost, including but not limited to the total expected value and the total present value, of Plaintiff Brian Reed's life care plan." Doc. 70, Defendants Motion, 1:28-2:6.  For medical expenses, Ms. Hyland used estimates of what health care providers would bill individuals for their services, full sticker price so to speak.  Plaintiff Reed's medical expenses have been and continue to be covered by Medicare, which only pays health care providers reduced rates.  For damages, Plaintiffs asked to recover the full billed amount for future medical expenses.  At November 24, 2014 hearing, the motion was granted and Plaintiffs were limited to recovering projections of what would actually be paid in the future as opposed to full billed rates. Doc. 106, Transcript, 59:8-11 and 61:18-24. The experts were permitted to issue amended reports using appropriate numbers. Doc. 106, Transcript, 62:7-11.

Plaintiffs ask for reconsideration on the basis that he will not be eligible for the discounted

8

Medicare rates in the future. Doc. 130, Plaintiffs Motion, 3:12-15. Plaintiffs explain that "Medicare payments are thus made *conditional on reimbursement* from the primary payer. (42 U.S.C. Section 1395y(b)(2)(A)(ii)). This federal statute enables Medicare to seek repayment of expenses out of personal injury settlements and awards, thus shifting the burden for such medical expenses from the taxpayers to the wrongdoer. (42 U.S.C. Section 1395y(b)(2); 42 CFR Section 46(d)(d)). Thus, Medicare makes conditional payment for medical expenses for beneficiaries with the understanding that Medicare will be paid when the beneficiary receives payment from a third party." Doc. 139, Plaintiffs Reply, 3:12-19, emphasis in original. Given this procedure, Plaintiffs have not explained how Plaintiff Reed would have to pay the full billed amount. At the hearing, Plaintiffs only refer to the general Medicare code section cited in their briefing, which does not resolve this issue. Further, Plaintiffs admit at the hearing that if the monetary sum set aside for paying Plaintiff Reed's shooting-related medical bills is ever exhausted in the future, Medicare would resume paying for those cases. In sum, Plaintiffs make a bald assertion about future costs without proving or even explaining how this is the case. There is no basis for reversing the earlier decision to grant this motion in limine.

**2. Defendants' Motion in Limine 7**

Defendants have filed a related motion in limine which seeks to exclude the testimonies of Hyland and Johnson altogether for failure to abide by the court's earlier ruling on Defendants' fourth motion in limine. Defendants assert that Hyland did not supplement her report with figures based on what Medicare and insurance companies would pay for services as opposed to the full billed amounts and that Johnson's work will suffer from the same fault as he is substantially dependent on the figures provided by Hyland. Doc. 127, Defendants Motion, 4:16-21. Plaintiffs assert that Ms. Hyland did produce an amended report which used alternate figures including Medicare payment rates. Doc. 132, Plaintiffs Opposition, 2:16-3:4. This appears to be a matter of factual misunderstanding between the parties that was resolved at the hearing. Hyland produced an amended report in December 2014 based on Medicare rates and customary rates for medical services Medicare does not cover. Then, when Plaintiffs decided to seek reconsideration of

9

1  Defendants' fourth motion in limine, they asked Hyland to make another amended report based
2  non-Medicare rates. Hyland produced this report in January 2015. Defendants received both the
3  December 2014 and January 2015 reports and reasonably thought the January 2015 report was the
4  final report. The two are alternate reports, to be used depending on this court's ruling on the
5  request for reconsideration. Focusing only on the December 2014 report, Defendants continued to
6  object to Hyland's use of customary rates for services not covered by Medicare.

7  As stated in the prior hearing, the amounts to be billed for future medical services are
8  uncertain so it is reasonable to use the actual amount paid in the past as a guide for making
9  estimates. Plaintiff Reed's past medical bills have largely been paid by Medicare, at Medicare
10 rates. The December 2014 report uses Medicare rates where possible and customary rates when
11 not. Defendants have not explained how this calculation of future medical cost differs from past
12 practices. There is no basis for excluding Hyland if her testimony is based on the December 2014
13 report. Similarly, Insofar as Johnson's report uses figures from the December 2014 report, there
14 would be no basis to exclude his testimony. Defendants' motion is denied.

### 3. Defendants' Motion in Limine 5

Defendants wish to exclude "any argument or evidence regarding trajectory issues or an opinion of which shot caused particular injuries to Mr. Reed....Plaintiffs are attempting to offer testimony and argument regarding which [] particular shot caused which particular injuries and testimony and argument regarding the body positioning of Officer Ziya and Mr. Reed at the time each shot was fired from non-percipient witnesses." Doc. 125, Defendants Motion, 1:26-28 and 4:6-8. This motion in limine has two parts.

Plaintiffs assert "Plaintiff was shot twice, once in the upper left arm and once in the lower back on the left side. Plaintiffs' medical expert, Dr. Jack Miller, is certainly qualified to testify about the various physical injuries that each of these shots caused and he will do so at trial." Doc. 133, Plaintiffs Opposition, 3:20-25. Defendants respond that "Plaintiffs intend to offer testimony from Dr. Jack Miller on which injuries were caused by the third shot, but Dr. Miller's Rule 26 expert witness report offers no such opinion. Because Dr. Miller did not offer any opinion on

which injuries were caused specifically by the third shot in his Rule 26 report, his testimony on the issue is inadmissible." Doc. 136, Defendants Reply, 2:28-3:4. The parties have not provided Miller's expert report. Assuming the analysis was part of his report, Miller is a neurologist and has the expertise to testify about different injuries that may have arisen from different wounds. However, there is no indication that he has the expertise to determine the sequence of events such that he can identify the order of gunshots or the relative body positioning of Plaintiff Reed and Defendant Ziya.

Regarding relative body positioning, Plaintiffs argue "It does not require an expert in ballistics or bullet trajectory to explain to a jury that if Plaintiff was shot in the back, then he was not facing the officer when he was shot." Doc. 133, Plaintiffs Opposition, 3:11-14. Under some circumstances, general lay testimony is sufficient to support obvious conclusions. See United States v. Pierson, 503 F.2d 173, 176 (D.C. Cir. 1974) ("The nature of the hole or crease made by a bullet hitting a wall is indicative of the direction from which a bullet was fired. We agree with the district judge that 'a layman, under certain circumstances can look at a bullet hole in a wall and see whether it appears to come from one direction or another'. No special expertise is required"); United States v. Beckford, 2000 U.S. App. LEXIS 6752, *19 (4th Cir. Apr. 13, 2000) ("one of the investigating detectives inserted a pencil into bullet holes found in the Tifton Court apartment to ascertain the angle of the bullet path"). Being shot in the back supports a general assertion that the shooter was behind the shootee without the need for an expert witness. This sequence of events may be presented in the testimony of Defendant Ziya or Koehler. But, if no percipient witness can testify that Plaintiff Reed was shot in the back, then some form of expert testimony (perhaps from Miller) may be necessary to support that conclusion. See McGrath v. Tavares, 757 F.3d 20, 27 (1st Cir. 2014) (at summary judgment, photographs of bullet hole positions in windshield and side window insufficient to raise inference shooter was not in front of car without expert testimony to support that conclusion, citing Fed. Rule of Evid. 701); Roberts v. Niebel, 2015 U.S. Dist. LEXIS 989, *32 (E.D. Pa. Jan. 6, 2015) (at summary judgment, no disputed fact established where "Roberts has admitted that he has no independent recollection of the events that occurred on August 31, 2011, and he offers no expert testimony to support his theory with respect to bullet

11

trajectory" and the medical expert stated "It is difficult to ascertain with any certainty the actual location of the entrance wounds").

Defendants also assert in their reply that "to the extent that expert Roger Clark intends to opine on the 'reasonableness' of the shooting, his testimony should be excluded, as it does not aid the trier of fact. Testimony of a police practices expert should be limited to whether action complied with generally-accepted standards on police procedures." Doc. 136, Defendants Reply, 3:4-8. Many courts allow police practices experts to state whether specific actions conform with a reasonable standard of practice. See Jimenez v. City of Chicago, 732 F.3d 710, 721 (7th Cir. 2013) ("The defendants argue that McCrary's testimony regarding reasonable police practices was intertwined with probable cause, a legal standard, and thus McCrary should not have been permitted to testify on the subject. We disagree. McCrary did not offer any opinion at trial as to probable cause at any stage of the investigation of Morro's murder or the prosecution of Jiminez. He testified only about reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures"); Hopkins v. City of Huntsville, 2014 U.S. Dist. LEXIS 153511, *12 (N.D. Ala. Oct. 29, 2014) ("The expert opinion of Dr. Gaut on the issue of whether defendants' actions and policies were consistent with reasonable, typical police practices and procedures is admissible"); Kirby v. City of E. Wenatchee, 2013 U.S. Dist. LEXIS 51920, *27 (E.D. Wash. Apr. 10, 2013) (in ruling on summary judgment, "The parties have engaged experts on police practices. Defendants rely upon Thomas Ovens who opines that a reasonable officer would believe that Marshall acted reasonably in employing deadly force (even though 'it was not Officer Marshall's role to resolve the crisis situation...'). Plaintiff's policies and practices experts include T. Michael Nault and Susan Peters. Peters opines that there were reasonable alternatives short of the use of lethal force available to Marshall, while the defense expert opines there were not. Peters also opines Marshall put himself in a vulnerable position, did not consider alternatives, and failed to adhere to basic law enforcement principles in doing so"); Samples v. Atlanta, 916 F.2d 1548, 1551 (11th Cir. Ga. 1990) ("the defense attorney posed a hypothetical based on the facts already in evidence regarding what Officer Oglesby saw as he approached David Samples on the night of the shooting. The attorney then asked for the

expert's opinion as to 'whether or not it was reasonable for the officer to discharge his firearm when David Samples charged him with a knife.' Over the plaintiffs' objection, the expert testified that in his opinion Officer Oglesby acted reasonably. We agree with the plaintiffs that the literal wording of the question posed tends to call for an answer that would invade the province of the jury, which in this case was to decide the reasonableness of the officer's actions. We find, however, that the questions leading up to this testimony, and the manner in which the expert answered the question, properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement"); C.B. v. Sonora Sch. Dist., 819 F. Supp. 2d 1032, 1045 (E.D. Cal. 2011) ("Ron Martinelli, Plaintiff's police practices expert, testified that he worked juvenile crimes and never handcuffed a child eleven years old or younger. Martinelli also testified that no reasonable officer would think it necessary nor objectively reasonable to handcuff a child in the totality of circumstances present in this case"); but see Valiavicharska v. Celaya, 2012 U.S. Dist. LEXIS 8191, *10 (N.D. Cal. Jan. 24, 2012) ("The parties shall follow these guidelines in directing the testimony of their police practices experts. These experts shall not testify as to whether Officer Tinney's use of force in the circumstances of this case was reasonable. Nor shall they testify as to Officer Tinney's subjective intent. They may testify as to what, if any, alternatives were available to Officer Tinney's use of force assuming a certain set of facts, but they may not testify that the facts must be found in a particular way").  Further, many courts have found that evidence of departmental procedures and nationally accepted practices (apart from the constitutional standard) to be irrelevant. See Legg v. Pappas, 383 Fed. Appx. 547, 550 (7th Cir. 2010) ("Katsaris is a 'police practices' expert and planned to testify about the various ways in which the officers violated police practice rules.... The district court excluded [Katsaris] because his testimony about police department policies and standards of police practice was irrelevant to determining what is objectively reasonable under the Fourth Amendment. We agree"); Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006) ("while the CPD's General Order may give police administration a framework whereby commanders may evaluate officer conduct and job performance, it sheds no light on what may or may not be considered 'objectively reasonable' under the Fourth Amendment given the infinite set of disparate

circumstances which officers might encounter"); United States v. Rodella, 2014 U.S. Dist. LEXIS 164773, *53 (D.N.M. Nov. 19, 2014) ("The Court concludes that Overby's testimony concerning nationally accepted police practices will not assist the jury in determining whether Rodella used excessive force, because Tenth Circuit and Supreme Court precedent dictates whether a constitutional violation based on excessive force occurred, and not from nationally recognized police practices"); Smith v. N.J., 2013 U.S. Dist. LEXIS 97353, *13-14 (D.N.J. July 11, 2013) ("Chief Longo's opinions about 'generally accepted policing practice and standards,' which comprise largely his entire report, do not fit the issues in this case. No issue in this case depends on establishing normal police practices or a deviation therefrom; the standards of conduct are measured by the U.S. Constitution and by the analogous provisions of the New Jersey Constitution. These provisions do not constitutionalize tort law; whether a particular officer followed accepted police practices is not the inquiry. A policeman may act or react in violation of desirable standards of police conduct without necessarily violating the constitution, and vice versa").

Defendants' motion is granted in part and denied in part. There is no expert witness in this case who can testify on the sequence of the shots. Percipient witnesses may testify on that subject. Medical experts may testify as to how specific wounds lead to different injuries if that was part of their expert reports. Defendants' request to limit the testimony of police practices experts is denied.

**4. Defendants' Motion in Limine 6**

Defendants seek to exclude "Plaintiffs from arguing that Officer Baker's use of the TASER against Plaintiff Brian Reed can form a basis for liability against Defendants." Doc. 126, Defendants Motion, 1:26-28. Plaintiffs filed an opposition six days late, indeed the Sunday immediately prior to the Monday hearing. See Doc. 153. Plaintiffs originally believed Koehler was the officer who fired a taser at Plaintiff Reed after he had already been shot at that point. Plaintiffs named Koehler as a defendant in this case but then discovered that it was a different officer, Michelle Baker, who fired the taser. Koehler was dismissed from this case, but Plaintiffs

14

did not move to make Baker a defendant.  Plaintiffs now wish to make a claim against Defendant City on the basis of vicarious liability for the state law battery and Cal. Civ. Code §52.1 claims without making a claim against Baker.

At the hearing, Defendants argued that to allow for such a claim at this point would be unfairly prejudicial as Defendants thought this theory of liability was no longer part of the case due to the misidentification.  Plaintiffs admit that they spoke with Defendants about the misidentification a long time ago and that neither side thought this issue was worth pursuing.  Plaintiffs did not explicitly state that there was an agreement with Defendants to preserve the claim against Defendant City notwithstanding the mistake of naming Koehler as a defendant.  At this point, the week before trial, it is much too late to resurrect this claim.  Defendants' motion is granted.

**C. Defendants' Ex Parte Request to Bifurcate Trial**

Defendants have sought to have liability and damages tried separately in two phases.  Plaintiffs seek to have liability and damages tried together, in one phase.  At the hearing, bifurcation was discussed.  Ultimately, a single phase for liability and regular damages was determined to be appropriate.  Defendants have now made a separate ex parte motion for bifurcation, arguing "some jurors will want to award damages to Mr. Reed once they hear about his alleged injuries, regardless of their assessment of liability issues.  Defendants expect that jurors will sympathize with Mr. Reed upon hearing that he was in a coma for one month after the shooting, or after hearing testimony regarding his alleged cognitive impairment." Doc. 160, Defendants' Motion, 6:12-16.  One court described the framework as, "The Rule 403 balancing test begins with the proposition that all evidence is inherently prejudicial; it is only unfair prejudice substantially outweighing probative value that permits exclusion of relevant evidence under Rule 403....Bifurcation may be appropriate when evidence is relevant to damages but irrelevant and highly prejudicial as to liability." Austin v. Hill, 2014 U.S. Dist. LEXIS 91543, *14-16 (E.D. Pa. July 7, 2014), citations omitted.  In this case, it is probably necessary to explore Plaintiff Reed's lapse into a coma and cognitive impairment during any liability phase to explain

why he has limited or no memory of the events of the shooting. While Plaintiff Reed's injuries may lead jurors to sympathize with him, these injuries are relevant and are not highly prejudicial. Defendants' request is denied.

## IV. Order

The motions are granted and denied as explained above.

IT IS SO ORDERED.

Dated:   April 24, 2015                              _____
                                                    SENIOR DISTRICT JUDGE