1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII


BRIAN REED, et al.,            )   1:11-cv-1083 AWI
                               )
          Plaintiffs,          )
                               )   REPORTER'S PARTIAL
     vs.                       )
                               )   TRANSCRIPT
CITY OF MODESTO, et al.,       )
                               )   Jury Trial, Day 2
          Defendants.          )
_____)

Fresno, California                 Wednesday, April 29, 2015




REPORTER'S TRANSCRIPT OF PROCEEDINGS










REPORTED BY:   GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR NO. 3278

APPEARANCES OF COUNSEL:

For the Plaintiffs:          LAW OFFICE OF STEVEN YOURKE
                             1048 Larkin Street, No. 11
                             San Francisco, CA 94109
                             By:  **Steven R. Yourke**
and
                             LAW OFFICE OF JOHN BURRIS
                             7677 Oakport Street, No. 1120
                             Oakland, California 94109
                             By:  **John L. Burris**

For the Defendants:          BURKE, WILLIAMS & SORENSEN, LLP
                             444 South Flower Street
                             Suite 2400
                             Los Angeles, CA 90071-2953
                             By:  **Nathan A. Oyster**
                                  **Susan E. Coleman**

1    Wednesday, April 29, 2015                    Fresno, California

2    (Trial in progress.)

3

4          MR. YOURKE:  Good morning, ladies and gentlemen.  My

5    name is Steven Yourke, together with my friend and colleague,

6    Mr. John Burris, I represent the plaintiff in this matter,

7    Mr. Brian Reed.

8          Mr. Reed will not be with us today.  We don't expect

9    him to attend a great deal of this trial, and I think it's

10   only fair that I let you know that in advance.  There will be

11   said many things in this case relating to Mr. Reed that could

12   cause him pain, to put it bluntly, things relating to his

13   present physical and mental state that could cause him to

14   suffer.  And so we're going to try to limit that to the extent

15   that we can.  He's a man who is delicate emotionally, cries

16   easily, he's a delicate person.  He's been through a lot.

17         Let me say this:  There are two phases of this case.

18   The first is liability.  The second is damages.  And in the

19   liability phase, we basically are talking about fault, who is

20   responsible for this situation.  Obviously we're bringing this

21   lawsuit, and we are claiming that a police officer, Officer

22   Ron Ziya, employed with the Modesto Police Department behaved

23   wrongfully.  That he behaved unreasonably in shooting

24   Mr. Reed.  So that will be one aspect of this case.  Logically

25   it is the first aspect to consider.

1           The second aspect has to do with damages, and there,

2    we're talking about Mr. Reed's injuries.  What happened to

3    Mr. Reed as a result of this shooting.  And in that aspect,

4    we're going to have several expert witnesses, medical experts

5    to testify regarding Mr. Reed's injuries, which are serious,

6    permanent, and numerous.  So I just want to give you a preview

7    that we're going to have experts coming in and testifying

8    about damages and then other witnesses examined about

9    liability.  It's not all going to be done consecutively

10   logically because expert witnesses have very busy schedules.

11   We have to try to do what we can to get these doctors on the

12   stand when they're available, so try to bear with me on that.

13           So let me tell you what the case is about here and

14   what I expect the evidence to prove.

15           December the 30th, 2010 is the date of the shooting.

16   At that time, Brian Reed was a 41-year-old man.  He was a

17   long-distance truck driver.  He was driving to and from Reno,

18   Nevada in diesel trucks as his job regularly usually at night.

19           He had been a driver, had a class A license for

20   several years, going back five, six years.  And he was living

21   with his long-term girlfriend, Susan Nava, in a single

22   residence home in Modesto.  They lived together with

23   Miss Nava's three children by a prior marriage, all of them

24   teenagers, two boys and a girl.  And also with the daughter

25   that Mr. Reed had in common with Miss Nava who was then

1    10-years old, Brianna.

2          Now, things were not going particularly well in their

3    relationship.  In fact, things were pretty rotten.  Miss Nava

4    wanted out of the relationship.  She had begun to see somebody

5    else, and she had told Brian.  I believe she told him the day

6    of the incident or possibly the day before.  But it really

7    shook him to the foundations, and he was extremely upset about

8    this.  He was depressed.  He was under a lot of stress with

9    his job, and it basically hit him pretty hard.  She was

10   saying, "Brian, I want out."

11         On that day and that afternoon, they had an argument.

12   When she told him, "Brian, I'm leaving," he got very upset,

13   and she packed up the car, put Brianna and her daughter Alice

14   in the back seat and drove off to spend the night with a

15   friend.  She didn't want to be there with all of the

16   commotion, all of the stress and unpleasantness of an

17   argument.

18         Brian was beside himself.  He gave a her a call on

19   the cell phone saying basically, "If you leave me, I will kill

20   myself." And she took that seriously.  She didn't know what to

21   do.  So Susan called Brian's dad and asked what should I do.

22   Your son has just told me that he's threatening to kill

23   himself if I don't come back.  And Bill Reed, Brian's father,

24   said, "I think you should call the police, let them know."

25   And so she did.

1            And Susan called 911, Modesto Police Department,

2    explained to them the situation.  She told them that Brian had

3    threatened to kill himself, that he was home alone, that there

4    were no guns in the home, no big dogs, just a little

5    chihuahua, and these were the sort of things that the police

6    want to know before they go and check out.

7            So the police basically said, look, we're going to

8    dispatch somebody to meet with you, and they basically

9    arranged to meet at the parking lot of a church nearby in

10   Modesto.

11           So Susan drove to the parking lot of the church, and

12   an officer was dispatched to meet with her, Officer Caelli

13   Koehler.  Officer Koehler was dispatched to basically handle,

14   investigate this situation and assigned by dispatch to assist

15   her was Officer Ron Ziya.  So she was the primary responding

16   officer, and Officer Ziya was her assistant back-up officer,

17   so to speak.

18           Officer Koehler arrived at the church parking lot.

19   Officer Ziya was coming from downtown, so he was going to be

20   delayed a little while, and Officer Koehler met with Susan and

21   discussed the situation.  Susan explained that Brian had

22   threatened to kill himself, and Officer Koehler said, "Well,

23   we will -- we will check on him, but don't go back in the

24   house until you hear from us.  Don't go back until we tell you

25   that we've checked on him and give you the all clear to go

1  back."  Susan says fine.

2       She says, well, how long is it going to be before you

3  are able to check on Brian?  And Officer Koehler says, "Well,

4  I have to wait for backup to arrive.  My backup officer is

5  coming, and when I hook up with him, we'll basically go and

6  check on Brian.  It could be a few minutes."

7       Susan was getting nervous for Brian's sake.  She

8  thought that maybe the police would take too long.  He's

9  suicidal, he might harm himself in the meantime before the

10 police got there.  And so she did a rather foolish thing.  She

11 decided to go back to the house.

12      So she left Officer Koehler at the church parking lot

13 and drove in her VW Jetta back to the residence with the two

14 kids, Brianna and Alice in the back seat.  She parks in the

15 driveway of the residence -- oh, I should mention that Brian

16 had texted her in the meantime and said, "Honey, do you know

17 where my keys are?"  And she told this to Officer Koehler and

18 said, "Gee, maybe he's calmed down and he seems like he wants

19 to find his keys to go to work.  I don't know where they are,

20 but maybe he's relaxing a little bit."

21      In any event, she drove back to the house.  She parks

22 in the driveway, leaves the two kids in the back seat, goes in

23 the house via the garage, and sure enough, she finds Brian in

24 the bedroom.  He's locked himself in the bedroom.  He says,

25 "Go away, I just want to die."  And she pounds on the door.

1   Eventually she gains entry.  And she said, "Brian, knock it

2   off.  You've got to stop this.  The police are coming."

3   Well, Brian is beside himself.  He picks up a knife.

4   It is a folding knife with a handle about four inches and the

5   blade about three inches.  It's one of the collectable bunch

6   of knives, Dale Earnhardt, racer car driver, and he picks up

7   this sort of collectable knife, and he opens it up, and he's

8   putting it to his chest basically trying to slash himself and

9   saying, "Look, you know, I really mean it.  I'm going to kill

10  myself."  And Susan is saying, "Brian, you've got to knock

11  this off.  Stop."

12  So the two of them are having this enormous argument.

13  She's screaming at Brian, "No, no, no," meaning put the knife

14  away, stop with this insanity.

15  Well, just then, who arrives at the front door, but

16  two police officers.  Officer Koehler and Officer Ziya meet at

17  the house.  They don't meet at the church parking lot because

18  Officer Ziya found it was easier, quicker for him to just meet

19  Officer Koehler at the house, so that's what they did.  Park

20  their patrol cars outside, and they start walking up to the

21  house, and they notice the car in the garage, in the driveway,

22  rather.  Noticed the car in the driveway and the two kids in

23  the back seat.

24  Officer Koehler goes up and says, "Is your mom in the

25  house?"  "Yes."  So they walk up to the front door of the

1    house, and sure enough, they hear this commotion coming from

2    inside.  They hear an altercation.  They hear shouting.  They

3    hear thumps.  So they're concerned naturally, and the officers

4    pound on the door, "The police, open up, Modesto police, open

5    up."  Nothing happens for a little while.  They draw their

6    weapons.  Officer Ziya steps back.  He's about to try to kick

7    the door in.  Suddenly, the door handle slowly opens, the door

8    comes open, and the officers can see Susan and Brian as they

9    put it, wrapped up in each other.  There's pushing, there's

10   shoving.  There is screaming and yelling.  They don't see the

11   knife in Brian's hand at this point.  It's unclear to me

12   whether the knife was open or shut at this point, but they

13   don't see a knife in his hand.  They just see through the open

14   doorway the two people pushing, shoving, wrasling.

15        So the officers start yelling at Brian and Susan to

16   break it up, you know.  "Brian stop.  Susan stop.  Susan come

17   out.  Let go of her."

18        Susan says she was trying to push Brian back away

19   from the door for fear of his safety.  Obviously she realized

20   that he was carrying a knife.  There were two armed police

21   officers at the door.  She says that she tried to push him

22   back and away from the door for his sake.  That she yelled at

23   the officer, "He's only a danger to himself."  And that she

24   managed to push him away from the door back toward the rear of

25   the living room.

1        The officers don't remember it quite that way.

2 Officer Ziya says that Brian reached around the door.  It was

3 a two-part door, and the left side was open.  And he reached

4 around the right side of the door with his left hand, pounded

5 on it a few times, shouted some profanities at the police, and

6 basically say, "Hey, you want some of this," something like

7 that.  Words that were belligerent, words that were combative,

8 shall we say?  He didn't attack the police, but he was visibly

9 extremely upset.  Extremely angry.  And at this moment,

10 Officer Ziya says -- he reached around with his left hand.  He

11 released Susan, and he says Susan disappeared, he thought,

12 down the hallway to the right.  That's Officer Ziya's

13 testimony.

14        Officer Koehler, on the other hand, does not remember

15 anything about this banging on the door by Brian Reed.  She

16 does say that Brian and Susan moved back into the living room

17 still kind of wound up in each other, and that eventually

18 Susan did respond and move aside in compliance with the police

19 orders to get out, "Get out of there, move aside."  And that

20 she ran directly out the front door past Officer Ziya and

21 herself.  In fact, she says that Susan actually bumped into

22 her, collided with Officer Koehler at the entry of the house

23 as Officer Koehler was -- was coming in.

24        So, you see, there are some variations here as to

25 exactly what happened at that moment.  And I'm not accusing

1   anybody of fabricating.  I want to be clear about this.  I

2   think different people remember different aspects.  Things

3   happen very quickly.  People are focusing on different things

4   perhaps.  But I'm not accusing anybody of fabricating.  But I

5   do think that there are some -- some discrepancies as to

6   precisely what happened.

7        As to Brian himself, Brian does not really recall

8   very much about the shooting incident.  He has apparently

9   repressed that to a very large extent.  He does not really

10  recall much of what happened once the police arrived at the

11  doorway.  He has, as you will hear, he has suffered some

12  cognitive deficits, memory loss, post-traumatic stress

13  disorder, other serious problems.  So he does not have a great

14  recall about this incident.

15       So I'm largely taking the police officer's version of

16  the events as basically accurate for purposes of this case

17  because that's what I have to go on.  And I'm basically

18  arguing to you that given what they are saying, and especially

19  given what Officer Ziya is saying, that his conduct was not

20  reasonable, that his conduct was contrary to and in violation

21  of not only common sense, but his training as a police

22  officer, what officers are supposed to do in situations when

23  they are dealing with subjects who are suicidal.  And this was

24  not the way to handle the situation.  After all, they had been

25  called to the residence to conduct a safety check on Mr. Reed.

Plaintiffs' Opening Statement

12

1  And it is highly ironic that it would be Mr. Reed who would

2  wind up getting nearly killed in this situation.  Something

3  went terribly wrong.

4         Now, Officer Ziya was outside.  Brian Reed reaches

5  around the door, pounds on the back of the door, screams at

6  Officer Ziya.  Susan disappears.  As Officer Ziya says, he

7  didn't see her run outside, though obviously she did.  But he

8  lost track.  He thought she ran down the hallway down the

9  right.

10         Officer Ziya then is armed with a firearm.  He puts

11  that away, takes out his Taser, determined that he's going to

12  make entry and deal with Mr. Reed.  He basically at this point

13  becomes by default in a way the lead investigator here.  He's

14  supposed to be assigned as a back-up officer, but at this

15  point, he's taking the initiative.  And I'm not saying he's

16  just pushing Officer Koehler to the side, but he's basically

17  acting as though this is his case to investigate and to deal

18  with.

19         He makes entry through the door, but just before he

20  gets to the doorway, Brian Reed is now, he says, moving back

21  away from the door.  Susan is out of the picture.  Brian is

22  moving back from the door.  And Officer Ziya says that Brian

23  was around two to three feet from the front door when Officer

24  Ziya first noticed that he held a knife in his hand.

25         Now, Officer Ziya at this point had not yet crossed

13

the threshold into the house.  He says read was about six feet
away from him when he first saw the knife, which would place
him, Ziya, that is, a few feet outside; Reed, two to three
feed inside.

He says that he then switched from his Taser to his
firearm.  So now he's armed with a firearm because he sees the
knife.  He did not deploy the Taser immediately, which I think
was an error.  He simply said, okay, I'm going to go with my
firearm.

Officer Koehler already had her firearm out.  So
Officer Ziya comes through the front door.  As Reed is backing
away, backing away from the police, Susan is nowhere in sight.
Brian moves back and back to the far end of the living room.
He stands in front of the living room windows, the rear of the
house, approximately 16 feet from the front door.

Officer Ziya at this point advances on Mr. Reed with
his firearm in hand.  He hands off his Taser to his partner
and says, "Here, do something with this."  Officer Koehler has
already got a firearm in her hand, takes the Taser, has no
place to put it, and she just kind of tosses it on the sofa in
the living room.

Ziya has gone in ahead of Koehler.  Susan bumps into
Koehler at the doorstep.  Susan is out of the house.  She's in
no danger at all from anyone.  The only person in the living
room is Brian Reed.  And Brian has backed all the way to the

Plaintiffs' Opening Statement

14

1    rear of the living room, as far away from the police as he can

2    get.  He's holding the knife in his right hand.  He appears to

3    be angry.  The police say they can hear him growling and

4    grumbling, although they don't recall him actually saying

5    anything specific, but he appears to be very angry, very

6    belligerent.  Was he suicidal at this point in time?  Quite

7    possibly.  Quite possibly.

8         Brian did not attack the police.  Did not advance on

9    the police.  Did not lunge at the police, but he did hold the

10   knife in his hand.  The police advance on him.  I should say

11   when I say "the police," I mean specifically Officer Ziya.

12   Moves in, screaming at him, "Drop the knife, mother fucker,

13   drop the knife.  Drop the knife, mother fucker."  Brian

14   doesn't drop the knife.  Officer Koehler comes up behind

15   Officer Ziya, also yelling, "Drop the knife.  Drop the knife."

16   Brian doesn't drop the knife.

17        Officer Ziya standing at a distance of around 12 feet

18   by my estimation, maybe 10 feet by his own estimation, but

19   about 12 feet from Brian, starts shooting.  When I asked why?

20   He said, "Because I anticipated" -- basically that Mr. Reed

21   was going to attack him.  "I thought he was preparing himself

22   to attack me with the knife."

23        Brian is shot four times, four bullets of fire, all

24   of them by Officer Ziya.  Officer Koehler never fired a shot,

25   although she was there.

Plaintiffs' Opening Statement

15

1          Officer Ziya fired four times.  Three times while

2   Brian was standing at the back of the -- at the back -- at the

3   back of the living room.  But after the first shot -- and this

4   is very important.  Please focus on this.  After the first

5   shot was fired, Officer Ziya said in his deposition, "I saw

6   Mr. Reed turn to his right and make his way to a doorway

7   leading to the kitchen."  He was running for his life.  After

8   that first shot was fired, he was running to his right clearly

9   to try to avoid being killed.

10          Officer Ziya kept firing.  Four shots were fired in

11  all.  One of those bullets lodged in the door frame of the

12  door leading to the kitchen.  We believe that that bullet is

13  the one that caused massive hemorrhaging to Mr. Reed's liver,

14  implicated his other vital organs, caused tremendous

15  hemorrhaging.  Mr. Reed lost approximately 70 percent of his

16  total blood in his body.  And when he got to the hospital they

17  could not find a blood pressure.

18          And we believe that that is the reason why Brian Reed

19  has sustained a serious and permanent deficit in his cognitive

20  abilities across the board.  He's lost about 15 percent of his

21  IQ as measured by our neuropsychologist expert who will

22  testify about that, Dr. Morganthaler.  I'm getting ahead of

23  myself a little bit here.

24          Brian Reed collapses on the floor a foot or two from

25  the doorway that he was trying to get to.  He is bleeding out.

Plaintiffs' Opening Statement

16

1   There is blood all over the floor.  He falls to his knees and

2   then backward onto the floor.

3          Another officer arrives on the scene immediately

4   thereafter.  She fires a Taser at him, and eventually the

5   police go and collect the knife which had fallen from

6   Mr. Reed's hand near his body.  But Mr. Reed loses

7   consciousness.  The ambulance is called.  The ambulance

8   transports Brian to the emergency room of the local hospital

9   in Modesto.

10         The doctors did a fantastic job.  They absolutely did

11  a miraculous incredible job.  They worked on Brian and worked

12  on Brian.  These surgeons are just miracle workers.  They

13  saved his life.  The bleeding was just so unbelievable.  But

14  the blood loss was such that, unfortunately, permanent brain

15  damage was done.

16         Brian, I should mention, was also shot in the upper

17  left arm.  The bullet penetrated the bicep, smashed through

18  the femur, damaged the main nerve in the left arm, and to this

19  day, his left arm -- his left hand is practically useless.  He

20  can't grasp with it, barely do anything with it.  It's pretty

21  much useless appendage at this point.  He is fortunately

22  right-handed.

23         There was another bullet that struck him.  I believe

24  it was in the right shoulder.  And I can't -- honestly I'm

25  trying to remember where the fourth bullet struck him.  But

1   one of the bullets penetrated the window directly behind

2   Mr. Reed.  This bullet penetrated the window behind him and

3   lodged in a back fence, and that bullet, because it lodged in

4   the back fence, the police then could draw a string from where

5   the bullet lodged in the fence through the hole in the window,

6   and they could get on that shot -- in any event, they could

7   get a clear trajectory of where that shot was fired.  So we

8   have a line that we can use as a basis for placing the officer

9   where he was, and Mr. Reed where he was, at least when that

10  shot was fired.  It must have been one of the first

11  three shots.

12          Now, with your permission, I'd like to try to see if

13  I can use this -- this machine here.  Bear with me.  I'm not

14  the most mechanically-inclined person.  Here we have a

15  diagram.  I hope you can all see this.

16          THE CLERK:  Please state the exhibit number.

17          MR. YOURKE:  I'm sorry.

18          THE CLERK:  I'm sorry, please state the exhibit

19  number.

20          MR. YOURKE:  What did we say this was?

21          MR. BURRIS:  15.

22          MR. YOURKE:  Number 15?  Number 15?  Okay.  We're

23  looking at Exhibit Number 15.  I'm trying to put this the

24  right way up.

25          This is a sketch, ladies and gentlemen, that was

Plaintiffs' Opening Statement

1  drawn by the police official named Gumm, and it is a sketch

2  that basically shows us the -- the area in the house where

3  this took place, the shooting took place.  And this here, can

4  you see where my finger is?  This is the living room.  Okay?

5  This is the front door.  This is the couch that the Taser was

6  dropped on.  We believe we can prove the officer was standing,

7  according to Officer Koehler, right next to this couch here

8  where the tip of my finger is, where the first shot was fired.

9        Brian, we believe, was over here where these bullets

10  are, bullet holes in the window when the first shot was fired,

11  okay, on the other side of the living room, having retreated

12  from the doorway, retreated all the way back here.  Nobody

13  else was around.  Susan Nava was not in sight.  She was not in

14  the living room.  She was not in any danger from Brian Reed

15  when the shots were fired.

16        That Officer Ziya advanced to around this point where

17  he started firing.  Brian then turned to his right and tried

18  to run to the door over here, leading to the kitchen.  He

19  collapsed in his tracks right here where my finger is, the tip

20  of my finger.  Do you see where the 10 is?  Right under that,

21  that's where he would have collapsed.

22        Number 7 represents a bullet hole, right there.

23  Bullet hole in the doorway leading to the kitchen.

24        Number 5 over here, we believe, is the ejected casing

25  that matches this bullet hole, which leads us to the

1   conclusion that the officer fired that shot after having

2   advanced into the living room, fired it as Reed was

3   retreating, running for his life, because the -- the casings

4   on the Glock .45 typically -- and that's the gun that Ziya was

5   using are ejected to the right and behind.

6          Now, I would point out we also have casings, one here

7   outside the front door, one just inside the front door, and

8   one a couple of feet up from there, which will be consistent

9   with Ziya firing from this position, advancing into the living

10  room, three shots, and then the fourth shot from somewhere

11  over here as Reed is running this way.

12         I hope all of you can kind of get this idea from this

13  diagram of what it is we are trying to say here.  These shots

14  were fired in quick succession.  They were fired, we believe,

15  without pausing to consider and to assess the results of each

16  shot.  Police officers are trained to fire and then assess.

17  Fire, double tap, two quick shots, assess the situation.  I

18  don't think there was any assessing going on here.  I think

19  what happened here is that Officer Ziya was pumped up on

20  adrenaline.  He saw that knife, and he just -- his training

21  and his common sense just went out the window.  He completely

22  seemed to forget that he was there to conduct a check on

23  Mr. Reed's safety.  That it was Mr. Reed and his expressions

24  of an intention to commit suicide that had drawn the police to

25  that situation in the first place.  What should Officer Ziya

1    have done?

2           The first thing is, if nobody else is around

3    Mr. Reed, who is in danger of being harmed by Mr. Reed, you

4    don't advance on Mr. Reed.  That's number one.  Mr. Reed is in

5    a desperate state of mind.  He clearly is expressing that he

6    wants to die.  Susan Nava even said she heard Brian say, "I

7    don't want to live anyway, just go ahead and shoot me."

8           Now, the officers say they didn't hear that, and I'm

9    not going to argue about it one way or the other.  But the

10   point is, he's a desperate man.  This is not a criminal.  This

11   is not somebody who is, you know, a gangster who has to be

12   apprehended for the public good.  He's a desperate man, and

13   the last thing you want to do with a suicidal desperate man,

14   who is armed with a knife, who might even be trying to goad

15   you into shooting him so he can end his life, the last thing

16   you want to do is to squeeze him, push him back, corner him,

17   or scream at him, "Drop the knife, mother fucker, drop the

18   knife."  That's not how you approach suicidal subjects.

19   That's not how the police are trained to approach suicidal

20   subjects.  Quite the contrary.

21          Police officers do get called frequently to address

22   the problem of suicidal subjects, and they receive extensive

23   training, or they should, on how to do that.  What you want to

24   do, dealing with a suicidal subject like Mr. Reed, is to slow

25   things down, calm things down, talk, get him to talk.  Listen.

1   If you have a female officer available, and Officer Caelli

2   Koehler was a female officer who was assigned to deal with

3   this case, let the female officer talk to the desperate man.

4   Because she is less threatening.  Less confrontational.  They

5   have shown that that actually works.  That there is a benefit

6   to that.  You don't have to be a female officer to do the job

7   right.  But you have to be willing to address this person as a

8   desperate human being.  That you're there to try to keep from

9   killing himself.

10           That's what they were called to do.  And that just

11   went out the window when Ron Ziya decided to charge him in

12   that house and take command of the situation and start

13   screaming orders, "Drop the knife, mother fucker, drop the

14   knife."  And when Brian didn't drop the knife, to shoot him.

15           There are several things that Officer Ziya did wrong.

16   The first is, as I say, don't advance on him.  You see a --

17           MR. OYSTER:  Objection, Your Honor.  Becoming

18   argument.

19           THE COURT:  Again, opening statements are not

20   evidence.

21           MR. YOURKE:  I'm just giving you an idea what our

22   case is.  Number one, advance on Brian Reed, screaming at him

23   in this aggressive manner to drop the knife.

24           Number two, fire at him four times without issuing a

25   warning.  "Drop the knife or I will shoot."  If that's what

1  you intend, if that's what you intend to do, tell him clearly.

2  "If you don't drop the knife, I'm going to shoot you."  Don't

3  just scream, "Drop the drive, drop the knife" and then start

4  shooting.

5          Number three, once Brian Reed has turned to his right

6  and is no longer facing the officer, but is actually facing

7  away from the officer and trying to run away from the officer,

8  at that point, he no longer poses any credible threat to the

9  officer or anyone else even if we assume for the sake of

10  argument that Officer Ziya reasonably felt in danger of his

11  life initially when he fired that first shot, and we don't

12  concede that for one minute.  But even if we concede that,

13  once Brian Reed after the first shot has turned to his right

14  and is trying to run out the doorway to the kitchen to save

15  his own life, there is absolutely no excuse for continuing to

16  shoot at him.  Absolutely none whatsoever.  You don't just

17  shoot a man who is running away from you even if he happens to

18  be carrying a knife.  Unless he poses an immediate danger to

19  the life or safety of some other person, you don't do that.

20  Brian Reed was alone in that living room.  There was nobody

21  else in that house.  They'd been informed of that.  The police

22  knew that.  Susan was outside.

23          If Officer Ziya didn't see Susan run out the front

24  door, well, he certainly knew she wasn't in sight.  If she had

25  gone somewhere else in the hallway in the house, or whatever,

23

1   he certainly knew that she was nowhere in sight, nowhere in

2   immediate danger from Brian Reed.  So why, why continue to

3   shoot after Brian has turned and is trying to make his way to

4   save his life, to run away from him?  Makes absolutely no

5   sense at all.

6           Officer Koehler should have taken command of this

7   situation a little more than she did.  She let Officer Ziya

8   charge in ahead and take over what was basically her case to

9   investigate.  You know, she probably should have said, "Hey,

10  Ron, back off.  Back off.  Let's go back."  But they didn't.

11          These are -- in essence, if Officer Ziya was ever in

12  danger from Brian Reed, and we do not believe he ever was, but

13  if he ever was in danger from Brian Reed, it was because of

14  his own recklessness in advancing on Brian Reed.  If he was

15  ever in a position of danger, he put himself there through his

16  own recklessness.

17          Brian never ever advanced on the officer.  The

18  officer will admit this.  He never charged at the officer,

19  attacked the officer.  Brian was retreating.  He was like a

20  caged animal, desperate, with his back to the wall literally.

21  He was shot.

22          This is bad policing.  It's bad policing.  It

23  violates common sense.  It violates training.  And let's all

24  remember, there are a lot of desperate suicidal people in our

25  society, many more than I ever realized until I started

1  looking at this case, but police officers are called to deal

2  with suicidal people all the time.  It's part of their

3  training, and you don't approach a suicidal person the way you

4  approach a bank robber.  There are two different sides of

5  police work.  You have to be able to distinguish that.

6  Protect and serve includes people who are desperate.  You're

7  called there to do a safety check.  Do the safety check.  Once

8  Susan is out of the way and she's safe, your concern should at

9  that point be with Brian's safety.

10        Now, that has to do with pretty much the liability

11  aspect of this case, in terms of what we believe we can prove

12  that the officer -- the shooting officer did wrong.

13        Let me make this clear:  We are not trying to prove

14  that Officer Ziya is a monster, or that he is even a bad

15  officer.  He may be a fine officer in every other respect.

16  That's not what we're here to prove.  I don't want his badge.

17  I don't want his gun.  Nobody is going to send him to jail,

18  not in this case anyway.  If any disciplinary action is taken,

19  it will be taken independently of Mr. Burris or myself.

20        But I will say this:  He acted unreasonably,

21  unreasonably.  He's not a monster.  He's not a sadist.  We're

22  not saying he's an attempted murderer, calloused, hardened

23  individual.  He simply acted unreasonably.

24        The Fourth Amendment to the United States

25  Constitution protects us against unreasonable searches and

1   seizures.  A seizure, arrest, shooting must be reasonable in

2   order to be constitutional.  If it's not objectively

3   reasonable, then it's not constitutional.  It doesn't matter

4   what was the officer's intent, whether his intention in

5   shooting was good or bad.  It doesn't matter.  All that

6   matters is that the shooting was objectively unreasonable.

7   And there were four shots fired.  Each one of those shots has

8   to be justified independently of the others.  Four shots

9   fired.  Each one has to be justified, including the last one.

10          Having said that, let me talk to you a little bit

11  about -- about the injuries that Brian has sustained in his

12  damages.

13          Brian has sustained very serious injuries.  I

14  mentioned the cognitive deficit, the cognitive impairment.

15  He's been tested by a neuropsychologist, Dr. Eric

16  Morganthaler, who we'll be calling to testify in this case.

17          Dr. Morganthaler has conducted extensive evaluations

18  and testing of Mr. Reed and has concluded that he has

19  sustained a cognitive impairment, approximately a loss of 14

20  or 15 points on his IQ.  That at the time of the incident, he

21  had a -- what you call a premorbid IQ of around 92.  At the

22  present time, he tests 78.  That's about a 15 percent decline,

23  14 or 15 percent decline.  Significant.

24          Brian is not a vegetable.  Brian can walk and talk,

25  thank God.  But he's not the man he used to be.  He's on SSDI.

1   We seriously doubt he'll ever be able to work again, at least

2   gainfully employed.  If he does, it would have to be with very

3   close supervision, and it would have to be a job that does not

4   involve any sort of physical exertion or mental ability.

5   Something very simple.

6          Brian will never drive a truck again.  He'll never be

7   the man he was physically or mentally.  This was a man who

8   literally rebuilt an entire kitchen by himself.  I couldn't do

9   that, but he did that.  He was a strong capable person.  He

10  wasn't a genius.  He wasn't a rocket scientist.  He wasn't

11  going to be a professor at MIT, but he was a person of normal

12  average intelligence and an able-bodied person.  That's gone.

13         Brian suffers a very severe case of post-traumatic

14  stress disorder.  Post-traumatic stress disorder can be a very

15  serious problem for anybody who has ever had it or has been

16  close to somebody who has had it.  He -- this is something

17  that would be addressed by Dr. Richard Shaw, a Stanford

18  psychiatrist as well as, I believe, Dr. Morganthaler who will

19  talk about that.  And Dr. Miller as well.  Dr. Miller is a

20  neurologist.  He has evaluated Brian extensively.  He has

21  basically reached the conclusion, I believe, that Brian's

22  cognitive impairment is due in large part exclusively to his

23  shooting and the massive loss of blood that occurred.

24         When the brain does not receive sufficient blood,

25  brain cells die.  And Brian lost about 70 percent of his

27

1   blood.  They couldn't even find a blood pressure when they

2   took the medical.

3          So I think that to give you an overview, Dr. Miller

4   will talk about the neurological impact, the brain impact of

5   the shooting, what that caused, what damage was caused.  He

6   will also talk about the damage to the left arm, which is, for

7   all practical purposes, almost useless at this point, left

8   hand.

9          Dr. Shaw, psychiatrist, will talk about the ongoing

10  struggle with major depression that Brian has.  He is deeply

11  depressed.  Brian obviously had issues previously, or this

12  incident would not have occurred.  But he did have a history

13  of -- of depression.  We're not arguing that.  But it was not

14  so debilitating as it is today.

15         He has suffered tremendous psychological damage, not

16  being able to work, support himself and his kids.  The

17  physical pain that he is in all the time.  The upper left side

18  of his body is in pretty much chronic physical pain.  There

19  are so many things wrong with Brian that it's really hard for

20  me to even put them together.

21         Now, headaches.  He suffers from headaches as a

22  result of this.  Whether those are due to the blood loss -- or

23  Dr. Miller will be able to talk about that.  But chronic

24  headaches.

25         Now, I should mention to you that Brian, after the

1   shooting, fell into a period of despondency, fell into a

2   period of deep depression.  As I mentioned, he was in chronic

3   pain.  He was largely bedridden for the first year or so after

4   the incident.  He could hardly go to the bathroom without

5   somebody -- Susan or somebody else assisting him.

6          He was not able to work, as I say, and he started

7   to -- well, he got medications that he started to, I think,

8   take a little more of than he should have.  He was provided

9   with Vicodin for the pain.  He was provided with medical

10  marijuana, which I think he perhaps indulged in more than he

11  really should have.  I think that's a large part of dealing

12  with despair.  And he started to drink in 2012, in the summer

13  of 2012.  He started to drink heavily, and for a period of

14  roughly six months to a year in there, he was drinking far

15  more than he should have.

16         Dr. Morganthaler did some testing of Brian, and

17  observed that there was a significant cognitive decline, but

18  that because of the drinking and because of the use of the

19  Vicodin and the medical marijuana, that there were problems in

20  getting a clear reading on Brian without these intervening

21  variables that were complicating his tests.  And he suggested,

22  look, we need to get Brian clean and sober for an extensive

23  period of time, and then we can reevaluate.  And that's

24  exactly what we did.  And to his enormous credit, Brian went

25  into a rehab.  He completed it successfully.  He has been

1   clean and sober now for over two years.  He goes to AA

2   meetings regularly for two-and-a-half years.  I am very proud

3   of Brian, and I don't mind telling you, I like Brian.  I like

4   Brian Reed personally, and I care about him.

5          Brian went back and retested with Dr. Morganthaler

6   after getting totally clean, staying clean, and the results

7   were basically the same.  The second test showed an IQ of 79

8   like the first one.  This was a person who was suffering from

9   permanent cognitive deficits, clearly not caused by whatever

10  was going on with marijuana or Vicodin in 2012.

11         Now, I'm just bringing this to your attention.  I

12  think you should have the total picture.  This is what Brian

13  has been through.  He's been through hell, and he continues to

14  go through hell.  He shakes sometimes uncontrollably.  Just

15  shakes.

16         He's a delicate person.  He's a good person, I

17  believe, in terms of his basic fundamental moral character.

18  This is a good man.  This is a working man.  This is a guy who

19  did what he could do.  He had problems, yes.  He had problems

20  before with depression, yes.  But this is a guy whose life has

21  been changed forever, and that's why you're here today.

22         I ask you to listen carefully to the medical

23  evidence, to all of the evidence.  I'm sure you'll do the

24  right thing, find your way to justice in the end.  Thank you.

25

1

2          I, Gail Lacy Thomas, Official Court Reporter, certify
that the foregoing transcript is true and correct.

3

4   Dated:  05/06/2015              /s/ Gail Lacy Thomas
                                  GAIL LACY THOMAS, RMR-CRR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25