UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN REED, B.R., a minor, by her guardian ad litem, Roxanne Sayer,<br><br>Plaintiffs<br><br>v.<br><br>CITY OF MODESTO, a municipal corporation, Chief of Police HARDEN, in his individual capacity; Police Officer RON ZIYA, Police Officer CAELI KOEHLER, in their individual and official capacities,<br><br>Defendants | CASE NO. 1:11-CV-1083 AWI GSA<br><br>ORDER RE: RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW<br><br>(Doc. 235) |

## I. Background

On December 30, 2010, officers of the Modesto Police Department were called to the residence of Plaintiff Brian Reed and Susan Nava. Ms. Nava informed the police operator that Plaintiff Reed was suicidal and sought help to stop him from hurting himself. Upon arrival, Defendant Ron Ziya and Officer Caeli Koehler ("Responding Officers") saw Ms. Nava and Plaintiff Reed physically struggling inside; Plaintiff Reed had a knife. The Responding Officers ordered the two to separate and for Ms. Nava to come towards them. Ms. Nava complied and exited the room. The Responding Officers told Plaintiff Reed to drop the knife but he did not comply. Plaintiff Reed moved his foot and Defendant Ziya shot at him multiple times, hitting him three times.

Plaintiff Reed is suing Defendant Ziya and Defendant City of Modesto, alleging Defendant used excessive force in shooting him. The jury trial began on April 28, 2015. The case was submitted to the jury on the questions of 42 U.S.C. § 1983 liability for excessive force in violation of the Fourth Amendment, negligence liability, and damages. The jury returned a verdict on May 14, 2015 in favor of Plaintiff Reed, finding Defendant Ziya used excessive force and was

negligent; the jury awarded a total of $100,001 which comprised of $100,000 in past medical expenses (a figure the parties had stipulated to) plus $1 in noneconomic damages.

At the close of the Plaintiff Reed's case in chief on May 7, 2015, Defendants made a Fed. R. Civ. Proc. 50(a) motion for judgment as a matter of law, asserting Defendant Ziya used reasonable force, or in the alternative, that he was entitled to qualified immunity. Doc. 200. The motion was denied. Defendants have now made a renewed Fed. R. Civ. Proc. 50(b) motion for judgment as a matter of law. Doc. 235. Plaintiff opposes the motion. Doc. 238.

## II. Legal Standard

After a jury has returned a verdict, Rule 50(b) permits a party to renew its prior Rule 50(a) motion for judgment as a matter of law. Fed. R. Civ. Proc. 50(b). Because it is a renewed motion, "a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." EEOC v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009).

> A renewed motion for judgment as a matter of law is properly granted if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion. In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. While the court must review the entire evidentiary record, it must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe. If sufficient evidence is presented to a jury on a particular issue and if the jury instructions on the issue stated the law correctly, the court must sustain the jury's verdict.

Harper v. City of L.A., 533 F.3d 1010, 1021 (9th Cir. 2008), citations omitted. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000), citations omitted. "[F]or purposes of assessing a motion for judgment notwithstanding the verdict, the court must accept the jury's credibility findings consistent with the verdict." Bilbrey v.

Brown, 738 F.2d 1462, 1468 n.8 (9th Cir. 1984).  However, "a reasonable inference cannot be supported by only threadbare conclusory statements instead of significant probative evidence.  Consequently, JMOL is appropriate when the jury could have relied only on speculation to reach its verdict." Lakeside-Scott v. Multnomah County, 556 F.3d 797, 802-03 (9th Cir. 2009).  A party seeking judgment as a matter of law has a "very high" standard to meet because "credibility, inferences, and factfinding are the province of the jury, not this court." Costa v. Desert Palace, 299 F.3d 838, 859 (9th Cir. 2002).

### III. Discussion

Defendants make two arguments in their Rule 50(b) motion: Defendant Ziya is entitled to qualified immunity and Defendant Ziya was not negligent as a matter of law. See Doc. 235, Defendants Brief.

**A. Section 1983 Qualified Immunity**

The parties agree that the only shooting itself could give rise to a valid excessive force claim; the pre-shooting acts do not violate the Fourth Amendment. Doc. 235, Defendants' Brief, 8:14-15; Doc. 238, Plaintiff Opposition, 24:12-28.  Defendants assert qualified immunity applies to Defendant Ziya's decision to shoot Plaintiff Reed.

**1. Qualified Immunity Standard**

"Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sheehan v. City and County of San Francisco, 743 F.3d 1211, 1221 (9th Cir. 2014).  "[T]he Supreme Court set forth a two-part test for qualified immunity in excessive force cases.  First, we examine whether a Fourth Amendment violation occurred; second, we look to see whether the officers violated clearly established law" Santos v. Gates, 287 F.3d 846 (9th Cir. 2002).  "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This

3

inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.... The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 201-2 (2001).  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

      To elaborate on the second prong, "It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Saucier v. Katz, 533 U.S. 194, 205 (2001).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).  This involves "applying an objective but fact-specific inquiry.... we consider the state of the law at the time of the alleged violation." Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007).  Additionally, "we may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." Prison Legal News v. Lehman, 397 F.3d 692, 702 (9th Cir. 2005); Jones v. Williams, 2015 U.S. App. LEXIS 10862, *18 (9th Cir. June 26, 2015).

**2. Excessive Force Standard**

      Regarding the underlying question of constitutional violation, "Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures.  We ask whether the officers' actions are objectively reasonable in light of the facts and circumstances

confronting them. We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake. Stated another way, we must balance the amount of force applied against the need for that force." Bryan v. MacPherson, 630 F.3d 805, 823-24 (9th Cir. 2010), citations omitted. "[T]wo Supreme Court decisions chart the general terrain. Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), defines the excessive force inquiry, while Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985), offers some guidance tailored to the application of deadly force. Graham sets out a non-exhaustive list of factors for evaluating on-the-scene reasonability: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. In Garner, the Supreme Court considered (1) the immediacy of the threat, (2) whether force was necessary to safeguard officers or the public, and (3) whether officers administered a warning, assuming it was practicable." George v. Morris, 736 F.3d 829, 837-38 (9th Cir. 2013), citations omitted.

In the context of deadly force, whether the suspect posed an immediate threat to the safety of police officers or others is the predominate consideration: "Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others. On the other hand, it is not constitutionally unreasonable to prevent escape using deadly force where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Wilkinson v. Torres, 610 F.3d 546, 550 (9th Cir. 2010), citing Tennessee v. Garner, 471 U.S. 1, 11 (1985). "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997). "[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." Smith v. City of Hemet, 394 F.3d 689, 704 (9th Cir. 2005). "[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts."

1  Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001).  "If the person is armed—or
2  reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal
3  threat might create an immediate threat." George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013).
4  "This balance must be judged from the perspective of a reasonable officer on the scene, rather than
5  with the 20/20 vision of hindsight." Boyd v. Benton County, 374 F.3d 773, 779 (9th Cir. 2004),
6  citing Graham v. Connor, 490 U.S. 386, 396 (1989).

**3. Facts Of This Case**

The wording of verdict does not indicate specifically what facts the jury found.  The jury just made the statement that Defendant Ziya used excessive force against Plaintiff Reed.  Plaintiff Reed has only a limited memory of the incident.  Again, in evaluating a Rule 50 motion, the facts are viewed in the light most favorable to Plaintiff Reed, the non-moving party and all evidence favorable to the moving party that the jury is not required to believe must be disregarded. Harper v. City of L.A., 533 F.3d 1010, 1021 (9th Cir. 2008).  Defendant Ziya is an interested witness and the jury is not required to believe his testimony.  Officer Koehler, the other person present, may also be considered an interested witness as she is an employee of Defendant City of Modesto. See United States v. Bayer, 331 U.S. 532, 539 (1947) ("an employee of defendants and, hence, an interested witness); Sabatier v. Suntrust Bank, 301 Fed. Appx. 913, 915 (11th Cir. 2008) ("the testimony of interested witnesses (the Bank's employees)"); Tavoulareas v. Piro, 759 F.2d 90, 115 (D.C. Cir. 1985) ("Peterson, as a Post employee, was an interested witness, and the jury was entitled to evaluate her testimony accordingly"); Woods v. United States, 724 F.2d 1444, 1452 (9th Cir. 1984); Corona v. Hotel & Allied Servs. Union Local 758, 2005 U.S. Dist. LEXIS 18545, *23 (S.D.N.Y. Aug. 29, 2005) ("these are all interested witnesses, plaintiffs in the litigation or officers of defendants, possible preys to the temptations of selective memory and 'spun' testimony").  The jury is free to disbelieve their testimonies. See Charyulu v. Cal. Cas. Indem. Exch., 523 Fed. Appx. 478, 481 (9th Cir. 2013) (finding verdict was not against the weight of the evidence as "The witnesses who testified for Plaintiff that the insurance company's actions violated insurance industry standards were not disinterested, and the jury could consider the

1  witnesses possible biases when determining how much weight to give their testimony"). The
2  testimonies of Defendant Ziya and Officer Reed are considered to the extent they are favorable to
3  the non-moving party.
4      The events prior to the confrontation which lead to the shooting are relatively undisputed.
5  The Responding Officers arrived to check on Plaintiff Reed, who Ms. Nava said had threatened to
6  kill himself. They were expecting him to be alone at the house, but instead found Plaintiff Reed
7  and Ms. Nava in a physical struggle, pushing and shoving at each other with Plaintiff Reed's arm
8  wrapped around Ms. Nava and holding her by her shoulder. Doc. 239-2, Koehler May 6, 2015
9  Partial Transcript, 14:13-15:6. Plaintiff Reed obeyed an order to release Ms. Nava; Ms. Nava did
10 not immediately obey police orders to get away from Plaintiff Reed. Doc. 239-1, Ziya May 1,
11 2015 Partial Transcript, 17:19-18:9. Defendant Ziya stated that he was trying to arrest Plaintiff
12 Reed for "domestic assault." Doc. 239-1, Ziya May 1, 2015 Partial Transcript, 31:6-12. Domestic
13 violence that results in "a wound, or external or internal injury, including, but not limited to, injury
14 as a result of strangulation or suffocation, whether of a minor or serious nature, caused by a
15 physical force" is a felony under Cal. Penal Code § 273.5. Domestic violence (battery) that does
16 not result in such physical injury is a misdemeanor under Cal. Penal Code § 243(e)(1). Given the
17 sequence of events, the Responding Officers did not question Ms. Nava, observe any physical
18 marks, or see Plaintiff Reed strike Ms. Nava in any way. Doc. 239-2, Koehler May 6, 2015 Partial
19 Transcript, 50:22-52:4. There was no indication that Ms. Nava injured in any way. Thus, the
20 Responding Officers suspected Plaintiff Reed had committed a misdemeanor but had no
21 knowledge if he had committed a felony. "Whenever there is probable cause to believe that the
22 suspect has committed a crime involving the infliction or threatened infliction of serious physical
23 harm, deadly force may be used if necessary to prevent escape, if some warning has been given,
24 where feasible." Forrett v. Richardson, 112 F.3d 416, 420 (9th Cir. Cal. 1997). There was
25 insufficient evidence for the Responding Officers to believe that Plaintiff Reed had threatened to
26 commit serious physical harm on Ms. Nava.
27     Concerning the confrontation that resulted in the shooting, Defendants assert:
28     After seeing the knife and drawing his handgun, Officer Ziya issued a series of

commands to Plaintiff. Multiple times, the officers ordered Plaintiff to 'drop the knife.' These commands were loud enough to be heard by a neighbor, Teresa Edwall, who lived across the street from the residence.

Plaintiff had ample opportunity to drop the knife and comply with the officers' orders. Instead of dropping the knife, Plaintiff stood in an aggressive stance with his left foot forward of his right foot while he was less than 15 feet away from Officer Ziya. Officer Koehler remained behind Officer Ziya, who was concerned that someone else might be inside the residence.

After the officers made multiple commands to Plaintiff to drop the knife, Plaintiff made an aggressive move towards the officers, which led to Officer Ziya's decision to fire the initial shots. Officer Ziya described Plaintiff's move as the shifting of weight from Plaintiff's right foot, which was his rear foot, in anticipation of charging towards Officer Ziya. Plaintiff also had his body weight lowered with his head and shoulders moved forward.

Officer Koehler described the movement as Plaintiff's right foot moving off the ground to begin taking the first step towards Officer Ziya. Officer Koehler also testified that she would have shot at Plaintiff if she had a clear shot, which she did not. Plaintiff conceded that he heard orders to drop the knife and it is undisputed that the knife remained in his hands, pointed upwards in a clenched position.

Plaintiff remained on his feet after Officer Ziya fired the initial 3 shots. Plaintiff continued to hold the knife and continued to act aggressively towards Officer Ziya, which led to the firing of the final shot. It was undisputed that Plaintiff never dropped the knife until after he was on his knees, despite hearing multiple commands to do so, and that no shots were fired after Plaintiff fell to his knees.

Doc. 235, Defendants Brief, 5:15-6:16.[1]  Plaintiff Reed disputes this version of events, and in critical part, asserts:

When Officer Ziya started shooting at Plaintiff, Susan Nava had already run outside and was no longer in the house. (Kohler 61:15-21) Plaintiff was wielding a pocket knife with a blade approximately 3.5 inches long. (Kohler 63:17-22) Plaintiff moved his right foot forward a couple of inches just before the first shot was fired, but he did not move any closer to the officers when the first shot was fired. (Kohler 79:1-25) Ziya made entry and followed after Reed who had retreated toward the rear of the living room. He testified that he fired at Plaintiff because he had an assumed an aggressive stance that led him to think he was about to charge at him. (Ziya 15:1-17) When Ziya fired the first shot, he was in the entryway to the living room. (Ziya at 155:10) Brian Reed was standing within two feet from the rear window. (Ziya at 155:24) Ziya admitted that Reed could have been standing as much as twelve feet away when Ziya shot him. (Ziya 177:21-22) Ziya fired four shots in quick succession, without pausing to assess the situation between shots. After the first shot was fired, Reed turned to his right and started to make his way toward the doorway leading to the kitchen. (Ziya at 35:18-21) Plaintiff was struck with three bullets. One struck him in the right shoulder. A second bullet struck him in the left side of the chest and exited on the right side, a through-and-through shot that implicated several vital organs and caused massive liver damage. A third shot struck Reed in the posterior of the left bicep and exited from the anterior of the left

---

[1] Defendants' briefing makes multiple assertions about what happened on December 30, 2010 without providing any citation to evidence presented at trial.  The court has undertaken an independent review of the available transcripts and exhibits.

8

> bicep. Reed collapsed a foot or two from the doorway leading to the kitchen. An ambulance arrived a few minutes later and transported Reed to hospital.
>
> The police technicians collected four shell casings. Three were recovered from near the front door, one of them from outside the door and two from just inside the door. But the fourth shell casing was recovered from very near the south-west corner of the living room. A bullet hole was located in the doorway of the door leading from the living room to the kitchen. It was only a few inches above the floor and located in such a position that it could only have been fired from within the interior of the living room, not from near the door leading to the living room. This proves that Ziya did advance into the interior of the living room and fired at least one shot at Plaintiff as he tried to make his way toward the kitchen.

Doc. 238, Plaintiff Opposition, 6:13-7:16. The knife Plaintiff Reed had was small, with a blade between two and three inches long. Defendants Trial Exhibits L and M, admitted. The Responding Officers ordered Plaintiff Reed to drop his knife but did not warn him that they would shoot if he did not comply. Doc. 239-2, Koehler May 6, 2015 Partial Transcript, 128:10-18. An order is not equivalent to a warning that deadly force may be used. See <u>Mercado v. City of Orlando</u>, 407 F.3d 1152, 1154 (11th Cir. 2005) ("The officers identified themselves and ordered Mercado to drop his knife at least two times (once in English and once in Spanish), but he refused without making any threatening moves toward the officers. At no time did the officers warn Mercado that force would be used if he did not drop his weapon").

    The parties disagree as to whether Plaintiff Reed was threatening the Responding Officers with physical harm when he was shot. The parties agree that Defendant Ziya fired four shots at Plaintiff Reed, three of which struck him. Defendants assert that Defendant Ziya fired a burst of three shots and then a single shot a short while later. They assert that Plaintiff Reed was facing the Responding Officers and threatening them during both volleys. Plaintiff Reed agrees that he was facing the Responding Officers and holding a knife but denies that he was threatening them when Defendant Ziya fired his first volley. Plaintiff Reed also asserts that he was turning away from the Responding Officers and so definitely not confronting them when Defendant Ziya fired his second volley.

    Defendant Ziya claimed that Plaintiff was acting aggressively and "I had to shoot Mr. Reed because he lunged towards me." Doc. 239-1, Ziya May 1, 2015 Partial Transcript, 211:22-23. He described Plaintiff's actions as:

> he was coming back. He had the knife in his hand. He was kind of giving the

9

> motion of, 'Come on, let's go.' And then he began to drop his arm. And that's when his -- his hips being square, he's in a fighting stance. His right leg was behind his left, which is indicative of a lunge forward. He began to bring his arms up. This went back. I'm sorry. He began to bring his arms up. His right hand started to drop levels. The rest of his body began to drop a level, which would -- would -- basically it's termed as a spring. He's generating enough force from the ground to lunge forward. His right leg, which would be his driving leg, began to -- the heel began to raise. The foot was planted inside the ground, so that -- I'm sorry, the front part where the toes are, was planted. The ball of his foot was planted in the ground, but his heel was rising, and I could see the shift for the spring and then the lunge forward, if that's what you're referring to.

Doc. 239-1, Ziya May 1, 2015 Partial Transcript, 41:11-42:2. Under cross examination he admitted that, in fact, Plaintiff did not in fact lunge forward:

> A. .... I perceived that as a lunge. The fact that it wasn't accomplished doesn't mean that it wasn't a lunge, sir.
>
> Q. So you're saying that you anticipated Mr. Reed was going to lunge at you, that you equate that with Mr. Reed actually having lunged at you. Is that what your testimony is?
>
> A. To a certain regard, yes, sir.
>
> Q. It is. Okay. Now, you testified that Mr. Reed lunged at you, and you've also testified that he didn't lunge at you. Which way is it?
>
> ....
>
> A. He did not.

Doc. 239-1, Ziya May 1, 2015 Partial Transcript, 213:19-214:10. Officer Koehler stated "I wasn't entirely focused on Mr. Reed throughout the entire shooting." Doc. 239-2, Koehler May 6, 2015 Partial Transcript, 34:2-3. Officer Koehler did state that Plaintiff Reed did not physically advance on the Responding Officers. Doc. 239-2, Koehler May 6, 2015 Partial Transcript, 79:18-22. Officer Koehler also stated that Plaintiff Reed held the knife in his right arm and raised that arm up. Doc. 239-2, Koehler May 6, 2015 Partial Transcript, 35:18-22. There is some dispute about the distance between Plaintiff Reed and Defendant Ziya during the first volley of shots. Defendant Ziya estimated it to be 6 to 10 feet but said it could have been 10 to 12 feet. Doc. 239-2, Koehler May 6, 2015 Partial Transcript, 177:12-21. Officer Koehler estimated the distance as 6 feet but did not have a strong recollection of it. Doc. 239-2, Koehler May 6, 2015 Partial Transcript, 38:2-14. From this evidence, the jury could have found that Plaintiff Reed was not threatening the Responding Officers with physical harm prior to the first volley of shots. Taken in the light most

favorable to Plaintiff Reed, the jury could have found that he was not advancing on the Responding Officers and was not making any menacing motions aside from the simple fact that he was holding an unsheathed knife.

Defendant Ziya testified that between the first and second volley of shots, he "paused sufficiently to assess the situation before continuing to fire" which he estimated to be five to ten seconds. Doc. 239-1, Ziya May 1, 2015 Partial Transcript, 27:24-28:6. As Defendant Ziya stated that he had sufficient time to assess the situation before firing the second volley, those later shot(s) can be evaluated separately from the first volley. He described the sequence of events as "So there was the initial shots were [sic] fired. There was a pause. Further shots were fired. And that's when - after the shots had been fired, he turned and made that movement towards that door" and "he began to turn after those shots were fired." Doc. 239-1, Ziya May 1, 2015 Partial Transcript, 40:1-4 and 106:16-20. Defendant Ziya claimed that Plaintiff was directly facing him with his hips squared through both volleys of shots. Doc. 239-1, Ziya May 1, 2015 Partial Transcript, 41:8-42:2 and 110:18-111:21. This version of events concerning the second volley of shots is not corroborated by the physical evidence. The bullet that did the most damage hit Plaintiff in his side and not the front. Doc. 228, Miller April 29, 2015 Partial Transcript, 31:24-40:1. From this evidence, the jury could have reasonably concluded that Plaintiff was turning away and not confronting the Police Officers during the second volley of shots. Defendants have a different view of the events that night. However, the case was presented to a jury, which chose to disbelieve Defendants' evidence and find Defendant Ziya used excessive force.

Plaintiff Reed's view of events is consistent with the verdict and plausible given the evidence presented at trial.

**4. Law Applicable To These Facts**

Given these factual findings, the scenario in this case is similar to that in <u>Glenn v. Washington County</u>, 673 F.3d 864 (9th Cir. 2011). Police were called late at night to deal with a drunk teenager who had broken a car window and was threatening to kill himself with a pocketknife. The police confronted him in the driveway of his grandmother's house, shot him

11

with beanbag rounds, and then shot him with bullets when he turned and headed towards the house. The Ninth Circuit reversed the district court's grant of summary judgment for the defendants, finding

> Lukus stood in the driveway several feet from the officers (who could have moved farther away at any time, had they wanted to), with guns trained on him, while his friends stood behind the officers and his parents and grandmother were in their homes. By all accounts, Lukus stayed in the same position from the moment officers arrived and showed no signs of attempting to move until after he was fired upon....Viewing the evidence in the light most favorable to the plaintiff, even though Lukus remained in possession of the pocketknife, a jury could conclude that at the moment the officers shot him with the beanbag gun there was little evidence that he posed an 'immediate threat' to anybody
>
> ....
>
> The officers argue they were justified in resorting to deadly force because Lukus had begun to move toward the house where his parents were located, and the officers knew the front door had a broken lock. Thus, they reasonably feared that he could have attacked his parents with the knife so they shot Lukus to protect his family. Glenn counters that Lukus was not running toward the front door to attack his family, but instead took one or two steps seeking cover from the beanbag rounds by moving in the most obvious line of retreat, and was shot without warning....As with the use of beanbags, there are material questions of fact about Lukus' and the officers' actions that preclude a conclusion that the officers' rapid resort to deadly force was reasonable as a matter of law

Glenn v. Washington County, 673 F.3d 864, 874 and 880 (9th Cir. 2011). The facts of the case consistent with the jury verdict firmly establish that Defendant Ziya violated Plaintiff Reed's Fourth Amendment right to be free from excessive force.

Glenn was issued in 2011, after the confrontation that occurred in this case on December 30, 2010. However, multiple opinions issued before that date had clearly established that police officers may not use deadly force when faced with a person armed with a knife is similar situations. See Walker v. City of Orem, 451 F.3d 1139, 1160 (10th Cir. 2006) ("It was specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect"), citing Zuchel v. City & County of Denver, 997 F.2d 730, 735-36 (10th Cir. 1993); Reyes v. Bridgwater, 362 Fed. Appx. 403, 407 (5th Cir. 2010) (summary judgment denied when "Ceballos stood, in his own home, with a kitchen knife at this side, swaying slightly side to side, at a safe

1 distance away from the officers when Bridgwater opened fire. When Bridgwater arrived on the
2 scene, furthermore, he was responding to a 911 call reporting a 'domestic disturbance with
3 possible violence'; he was not, that is, anticipating making a felony arrest, or even necessarily any
4 arrest at all"); Herrera v. Las Vegas Metropolitan Police Dept., 298 F.Supp.2d 1043, 1050 (D.Nev.
5 2004) ("Decedent was not moving toward the officers when he was initially shot with the bean
6 bag rounds; was doubled-over with pain at the time the pepper spray was used; and was merely
7 standing with the knife pointed skyward, stunned, for nearly a full minute before he was shot and
8 killed"); Zulock v. Shures, 441 Fed. Appx. 294, 302 (6th Cir. 2010) ("In this case, Shures, who
9 had been trained that an officer needed a minimum of 21 feet between himself and a knife-
10 wielding suspect for safety and who was standing approximately 18 or 20 feet away, shot while
11 Zulock: (1) was standing in his own kitchen, holding a cooking knife; (2) had taken no threatening
12 actions other than saying 'fuck you' four or five times; (3) had put down the knife in response to
13 commands, but then had turned toward Shures, picked up the knife, turned toward the back of the
14 house, made a 'smart remark,' and taken one-half step or one step away from Shures. Even given
15 the speed of this encounter, no reasonable officer could think that a man who had done nothing
16 more than swear four or five times and was walking away represented an immediate threat of
17 serious physical harm"); Baker v. Putnal, 75 F.3d 190, 198 (5th Cir. 1996) ("According to the
18 report, Baker, Jr., received four gunshot wounds, one to the left arm, one through the right upper
19 back, one through the left flank, and one through the left temple. The nature of the wounds
20 indicate that Baker, Jr., was not facing Putnal when he was shot. The number of shots and the
21 nature of the wounds raise a serious question as to the reasonableness of his conduct, more of a
22 question of fact than a court may dispose of on summary judgment"); Samples v. Atlanta, 846
23 F.2d 1328, 1332-33 (11th Cir. 1988) ("we note that one of the bullets struck Samples in the back.
24 This raises a serious issue of fact. Of course, it is possible that the force of the first four bullets
25 spun Samples around, so that the fifth struck him in the back. However, it is also possible that
26 after Samples turned to run away, Oglesby continued shooting. Another possibility is that the first
27 shot hit Samples in the back, and that this so angered Samples that he turned around and started
28 running at Oglesby. In either of the latter two scenarios, serious issues of fact exist regarding the

13

1   question of excessive force"). In order to justify use of deadly force, it is not enough that a person
2   armed with a knife takes "dangerous, threatening, or aggressive actions;" their actions must
3   "pose[] a threat of serious physical harm." Ludwig v. Anderson, 54 F.3d 465, 473 (8th Cir. 1995).
4   Given this case law, the contours of the right to be free from excessive force were clear enough
5   such that a reasonable police officer would have understood his/her actions violated that right.

6   Defendants discuss nine cases in which courts found no Fourth Amendment violation
7   when police shot individuals wielding a knife/rock, asserting that these cases contain facts similar
8   to the situation at hand. Doc. 235, Defendants Brief, 12:18-20:14. However, in most of these
9   cases, the court found that the person holding the knife advanced on the police. See City & Cnty.
10  of San Francisco v. Sheehan, 135 S. Ct. 1765, 1775 (2015); Lal v. California, 746 F.3d 1112, 1117
11  (9th Cir. 2014); Barber v. City of Santa Rosa, 2010 WL 5069868, *6 (N.D. Cal. Dec. 7, 2010);
12  Maceachern v. City of Manhattan Beach, 623 F. Supp. 2d 1092, 1103-4 (C.D. Cal. 2009); Robbins
13  v. City of Hanford, 2006 WL 1716220, *15 (E.D. Cal. June 19, 2006); Estate of Larsen v. Murr,
14  511 F.3d 1255, 1260-61 (10th Cir. 2008); Rhodes v. McDannel, 945 F.2d 117, 120 (6th Cir.
15  1991); Roy v. Inhabitants of Lewiston, 42 F.3d 691, 693 (1st Cir. 1994). The exception is
16  Woodward v. Town of Brattleboro. The District of Vermont granted summary judgment for
17  defendants, finding no excessive force where police shot an individual relying solely on three
18  undisputed facts: "(1) Woodward was armed and reported to be agitated or psychotic; (2) he
19  disobeyed orders to drop his weapon; and (3) he was in a position to, suddenly and without
20  warning, injure another person in his proximity [within 21 feet]." Woodward v. Town of
21  Brattleboro, 2006 WL 36906, *6 (D.Vt. Jan. 5, 2006). Examining the background of the case, this
22  court declines to rely on Woodward. The opinion cited by Defendants is the second summary
23  judgment order issued by the District of Vermont. The first, also in favor of police defendants,
24  was reversed by the Second Circuit, which stated "four witnesses gave sworn statements that
25  Woodward made no advances or threatening moves toward the Officers or any bystanders before
26  he was shot....The district court may thus have been improvident to discount these witness
27  statements." Woodward v. Town of Brattleboro, 148 Fed. Appx. 13, *14-15 (2nd Cir. 2005). On
28  remand, the District of Vermont replied that "the Court notes it did not 'discount' the affidavits of

Ames, the Hunts and Wilson; it fully considered their content and materiality to the issues pending resolution. Rather, this Court found the discrepancies their statements raise are not material under the applicable legal standard." Woodward v. Town of Brattleboro, 2006 WL 36906, *1 (D.Vt. Jan. 5, 2006). That is, the District of Vermont concluded it did not matter whether the decedent made threatening moves; the fact that he had a knife, was reported to be agitated, refused orders to drop the knife, and was within 21 feet of people was justification to shoot him. The parties settled the case thereafter so the Second Circuit did not have an opportunity to express its opinion about this legal holding. This court does not find the District of Vermont's ruling to be consistent with the other precedent discussed above.

**5. Conclusion**

Interpreting the evidence in a manner favorable to Plaintiff Reed supports the jury's verdict that Defendant Ziya used excessive force in violation of the Fourth Amendment. Plaintiff Reed did not advance on the Responding Officers and was not making movements that threatened physical injury to anyone. No direct warning was given before Defendant Ziya started shooting. The Responding Officers had reason to believe there was a domestic disturbance but no reason to believe anyone was injured. Defendant Ziya also shot Plaintiff Reed when he was turned away. The case law existing at the time of the incident was sufficiently clear to warn Defendant Ziya that his actions violated the Fourth Amendment. Qualified immunity is not warranted as the contours of the applicable right were clear.

**B. Negligence**

Defendants argue that the negligence claim must fail. Plaintiff Reed asserts that this issue was not raised in the initial Rule 50(a) motion and thus can not be considered at this stage of the litigation. Doc. 238, Plaintiff Opposition, 25:20-23. That is incorrect; Defendant did seek judgment as a matter of law for their negligence claim in their Rule 50(a) motion. See Doc. 200, Defendants Rule 50(a) Brief, 13:18-15:2.

"In order to prove facts sufficient to support a finding of negligence, a plaintiff must show

that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." Hayes v. County of San Diego, 57 Cal. 4th 622, 629 (Cal. 2013), citations omitted. "Under established law, police officers have a duty to use reasonable care in deciding to use and in fact using deadly force. An officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." Brown v. Ransweiler, 171 Cal. App. 4th 516, 534 (Cal. App. 4th Dist. 2009), citations omitted. Defendants admit their argument regarding negligence is that "Because Officer Ziya's use of force was reasonable under the Fourth Amendment, it was privileged under state law." Doc. 235, Defendants Brief, 23:13-14.  In this circumstance, the Fourth Amendment excessive force violation is sufficient to constitute negligence under California law. See Young v. County of Los Angeles, 655 F.3d 1156, 1170 (9th Cir. 2011) ("the Fourth Amendment violation alleged by Young also suffices to establish the breach of a duty of care under California law").

In fact, "state negligence law, which considers the totality of the circumstances surrounding any use of deadly force is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." Hayes v. County of San Diego, 57 Cal. 4th 622, 639 (Cal. 2013).  Plaintiff Reed has stated that he does "not seek to establish that the shooting was unreasonable because Ziya's pre-shooting actions were unreasonable." Doc. 238, Plaintiff Opposition, 24:22-24.  Thus, these discrepancies between federal and state law need not be addressed.

**IV. Order**

Defendants' motion for judgment as a matter of law under Fed. R. Civ. Proc. 50(b) is DENIED.

IT IS SO ORDERED.

Dated:   August 6, 2015                          _____
                                                 SENIOR DISTRICT JUDGE